Filed 10/16/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LUCY WEST et al., | B334178 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No.23STCV03367) |
| v. | |
| SOLAR MOSAIC LLC, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Elaine Lu, Judge.  Affirmed.

Sheppard, Mullin, Richter & Hampton, Robert J. Guite and Khirin Bunker, for Defendant and Appellant.

Kemnitzer, Barron & Krieg, Kristin Kemnitzer, Adam McNeile and Malachi J. Haswell, for Plaintiffs and Respondents.

———————————————

A home improvement and solar panel salesperson visited the home where senior citizens Harold and Lucy West lived with their adult daughter Deon.[1]  By the time he left, a loan agreement package had been completed electronically with Harold's electronic signature.  A subsequent dispute led to litigation, and lender Solar Mosaic LLC (Mosaic) petitioned the court to compel arbitration based on arbitration provisions in the loan agreement.  The trial court declined on the ground that Mosaic had failed to establish the existence of an agreement to arbitrate.  We affirm the court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2022, Ilai Mitmiger, a sales representative for Elite Home Remodeling, Inc. (Elite), visited Harold, Lucy and Deon at the Wests' home.  Harold and Lucy were both in their 90's and suffered from dementia.  Neither used e-mail, computers, or mobile phones.

When Mitmiger arrived, Deon woke Harold and brought him from bed into the living room.  There, in Mitmiger's account, Mitmiger informed the Wests of the home solar installation Elite could provide and the availability of financing through Mosaic. He examined a recent electric bill and told the Wests he "believed they could potentially reduce their electric bill by going solar" and "might be eligible to receive tax credits."  According to Mitmiger, "all three family members" asked him questions about "how solar works."  Harold and Lucy, Mitmiger declared, "appeared to be excited about moving forward with a home solar system."  Also according to Mitmiger, Deon told him "the family had previously

---

[1]      We refer to the Wests by their first names for clarity.

2

spoken with two other contracting companies about a potential home solar installation but that Elite seemed to be the right company for the job." Mitmiger said he heard Deon suggest to her parents that Elite should perform the work.

In Mitmiger's version of events, when Mitmiger mentioned that Elite offered home renovation services, Harold and Lucy insisted he inspect their bathroom, which was in disrepair and had visible mold growth. They informed him the bathroom needed plumbing and electrical work and asked about replacing the tile. Mitmiger said he told them Elite could perform this work.

According to Deon, Mitmiger never mentioned being associated with Elite or Mosaic and instead claimed to work with a government program that helped senior citizens to fix up their homes. Harold and Lucy had previously had their home painted at no cost by Habitat for Humanity, and Deon asked if the program Mitmiger was working for was similar to Habitat for Humanity. Mitmiger said it was.

In Deon's account, Mitmiger said he could obtain a new shower for the only bathroom in the house that had a shower and bathtub. He said it would cost $25,000 to renovate the bathroom, but did not specify who would pay for it. Mitmiger also said he could include solar panels on the home at no additional cost. To Deon's knowledge, her parents had never considered installing solar panels, but Mitmiger said solar panels could lower Harold and Lucy's taxes and electric bills. According to Deon, they never discussed how her parents would pay any of the cost of this work, and Mitmiger did not ask for any financial information from them. Harold and Lucy lived on their retirement and Social Security benefits, and they could not afford to pay $25,000 for a

home renovation. Based on what Mitmiger told them, Deon believed the renovations would be paid for, at least in part, by Mitmiger's government program.

During this conversation, in Deon's view, Harold "did not seem to understand what was going on." According to Deon, Mitmiger obtained her e-mail address so he could send a "quote." In Mitmiger's account, Harold and Lucy informed him they wanted to proceed with the installation and financing of the home solar system and a bathroom renovation, so Mitmiger asked Mosaic to send a loan agreement package by e-mail for their review and signature.

Mosaic sent documents to Deon's e-mail address. An initial set of documents apparently did not process correctly, so an Elite employee telephoned Mosaic and the documents were re-sent. Speaking with Deon, the Mosaic representative said she had sent the documents to "Harold's E-mail address," and Deon said, "Oh, my E-mail address? Okay. I'll go—I'll go to my E-mail."

Mosaic uses DocuSign for its contracts. The signature process is: (1) documents are e-mailed from Mosaic to the signer; (2) the signer receives an e-mail requesting that they sign online; (3) the signer clicks the link in the e-mail to open the document for review, and the document has areas marked for the signer to execute; (4) the signer creates a DocuSign electronic signature and clicks to place their signature in the document; and (5) once the signature has been inserted in all the required locations, the signer confirms signing as the final step and clicks a button saying "Finish."

The documents were sent to Deon's e-mail address at 6:29:20 p.m. They were viewed on a mobile device at 6:29:30 p.m. The documents were signed electronically in Harold's name and

completed at 6:29:43 p.m.[2]  Harold's electronic signature appears in seven places in the 33-page long loan document package.

Deon told the Mosaic representative, "It's completed."  The Mosaic representative asked Deon if she was Harold; Deon said no.  The Mosaic representative asked to speak with Harold.  When asked if he understood that the telephone call was being recorded, Harold's response was unintelligible.  The representative explained they needed to begin with identity verification and asked for consent.  After a six-second pause, Harold said, "Okay."  The Mosaic representative asked for Harold's full name and birthdate, and after pausing for several seconds, Harold said, "What's the day?  Oh, what's the year?"

After another silence from Harold, during which time another voice could be heard in the background, the representative asked, "Hello?"  Harold then provided his birthdate.  She asked Harold for the final four digits of his Social Security number.  Harold was silent for another 10 seconds before answering.

The representative asked Harold for the telephone number and e-mail address of his account.  After another pause, Harold provided a partial e-mail address, and a female voice in the background could be heard supplying him with the rest of the e-mail address, which he then repeated.  The representative again asked Harold for the telephone number on the account.  Harold paused and then provided a partial telephone number.  The representative asked for the area code.  Harold was silent for several seconds, and the female voice in the background could be

---

[2]    Mitmiger declared he had stepped out of the room to take a telephone call while the loan documents were completed.

heard, after which time Harold said something inaudible and then gave his zip code.  The representative asked for the area code again, after which time Harold gave a full telephone number.

The Mosaic representative then spoke for several minutes about topics such as the estimated first payment; the multiple possible dates the first payment could be due; the possibility payments would be owed before the system was operational; the need to make a paydown of approximately 26 percent of the loan amount within 18 months of the start date in order to keep the monthly payments the same for the life of the loan; the expected rise in the monthly payment in the absence of that paydown; the fact that if he sought federal tax credits for the installation, the credit and the amount he would receive would be dependent on his personal tax situation; the annual percentage rate; the availability of autopay services; and the discount on the annual percentage rate for autopay enrollment.

Every few sentences, the Mosaic representative stopped and asked Harold if he understood.  Each time Harold paused for several seconds, then responded with "yeah" or "yes."  A female voice could be heard in the background several times.  The only question Harold answered immediately was whether he had any questions.  As he said no, the representative concluded the call.

It took less time for the Mosaic representative to give Harold all the information about the loan and secure his one-word responses than it had taken to elicit from him his birthdate, the last 4 digits of his Social Security number, and the e-mail address and phone number associated with the account.

According to Deon, workers came to the house the following day and demolished the bathroom that was to be renovated. Deon tried to contact Mitmiger to ask how much, if anything, the work would cost her parents, but Mitmiger never responded.

Deon declared that in August 2022 she discovered the construction contract and loan agreement. Deon denied she and/or her parents had entered into a contract, and she attempted to cancel it. Elite refused. Work ceased on the West home, leaving Harold and Lucy to bathe in their kitchen sink because Elite had demolished their only shower and bathtub. Elite contended it was refused access to the home, attempted to collect payment from Harold and Lucy, and filed a mechanic's lien on the property. Harold and Lucy sued Elite and Mosaic.

Mosaic petitioned the trial court to compel arbitration based on arbitration provisions in the electronically-completed loan agreement. The trial court denied the petition on the ground that Mosaic had not met its ultimate burden of proving the existence of an arbitration agreement, specifically finding Mosaic had not proven Harold was the person who completed the loan documents or that Deon had the authority to bind Harold to an arbitration agreement. Mosaic appeals.

## DISCUSSION

### I. Applicable Law

When a party to a civil action asks the trial court to compel arbitration of the pending claim, the court must determine whether an "agreement to arbitrate the controversy exists." (Code Civ. Proc., § 1281.2; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413.) "Because the existence of the agreement is a statutory prerequisite to granting

7

the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence." (*Rosenthal*, at p. 413.)

The trial court determines whether an agreement to arbitrate exists "using a three-step burden-shifting process." (*Iyere v. Wise Auto Group* (2023) 87 Cal.App.5th 747, 755 (*Iyere*).) First, the party petitioning to compel arbitration must state "the provisions of the written agreement and the paragraph that provides for arbitration. The provisions must be stated verbatim or a copy must be physically or electronically attached to the petition and incorporated by reference." (Cal. Rules of Court, rule 3.1330; see *Iyere*, at p. 755.) Signatures on the arbitration agreement need not be authenticated at this initial stage. (See *Condee v. Longwood Management Corp.* (2001) 88 Cal.App.4th 215, 218–219.)

If the petitioner meets their initial burden, the burden of production shifts to the party opposing the petition to compel arbitration, who must offer admissible evidence creating a factual dispute as to the agreement's existence. (*Iyere, supra*, 87 Cal.App.5th at p. 755.) When the dispute centers on the authenticity of signatures, "[t]he opponent need not *prove* that his or her purported signature is not authentic, but must submit sufficient evidence to create a factual dispute and shift the burden back to the arbitration proponent, who retains the ultimate burden of proving, by a preponderance of the evidence, the authenticity of the signature." *(Ibid.)*

On appeal, with respect to the burden of production, we review de novo the trial court's ruling that the arbitration opponent's evidence was sufficient to create a factual dispute shifting the burden back to the proponent of arbitration. (*Iyere,*

8

*supra*, 87 Cal.App.5th at pp. 755–756.)  With respect to the ultimate question whether an agreement to arbitrate exists, " ' "[i]f the court's order is based on a decision of fact, then we adopt a substantial evidence standard." ' [Citation.]  When, as here, the court's order denying a motion to compel arbitration is based on the court's finding that petitioner failed to carry its burden of proof, the question for the reviewing court is whether that finding is erroneous as a matter of law.  [Citations.]  ' "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' " (*Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1066–1067 (*Fabian*).)  " ' "[U]nless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found the [party's] evidence lacks sufficient weight and credibility to carry the burden of proof.  [Citations.]  We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." ' [Citation.]  'The appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably to the prevailing party and in support of the judgment.  [Citation.]  " 'All conflicts, therefore, must be resolved in favor of the respondent.' " ' " (*Id.* at p. 1067.)

II.     Burden of Production

Mosaic argues the trial court's ruling on the motion to compel arbitration was erroneous because once Mosaic met its initial burden of production and the burden shifted to the Wests, they failed to submit evidence sufficient to meet their burden of demonstrating a factual dispute as to the authenticity of Harold's

electronic signatures. Mosaic is incorrect. The loan documents were sent to Deon's e-mail address, Deon told the Mosaic representative she would go check her e-mail, the documents were opened on a mobile phone 10 seconds after being sent, they were completed with seven electronic signatures within the space of 13 seconds, and Deon confirmed the documents' completion. Harold was in his 90's, suffered from dementia, did not use a computer, mobile phone, or e-mail, and was unable to answer simple questions such as his birthdate and telephone number without assistance and significant delay. The evidence strongly suggests Harold lacked the technical facility to open his daughter's e-mail on what was presumably her mobile phone, create a digital signature, electronically click through and execute the loan agreement in seven locations, and submit those signatures, all in the space of 23 seconds, and it unquestionably demonstrates the existence of a factual dispute as to whether Harold actually executed the electronic signatures on the loan documents.

Mosaic argues the evidence was insufficient to demonstrate a factual dispute because "Harold himself never submitted any declaration or affidavit to support the assertion that he did not sign the Loan Agreement."[3] Mosaic offers no authority to support its contention that a personal declaration from Harold was required to shift the burden of production back to Mosaic, and we

---

[3]     Respondents request we take judicial notice of the trial court's August 2023 order appointing a guardian ad litem for Harold as support for their assertion that Harold could not have submitted a declaration in opposition to the motion to compel arbitration. We deny the request because the order is not necessary to resolve the issues presented on appeal.

are not aware of any such authority. Mosaic has not demonstrated any error.

III.    <u>Agency/Ratification</u>

"An agent is someone who represents another—the principal—in dealings with third parties. (Civ. Code, § 2295.) 'An agent has such authority as a principal actually or ostensibly confers upon him. ([*Id.*,] § 2315.) Actual authority is such as a principal intentionally confers upon an agent, or intentionally or by want of ordinary care allows the agent to believe himself to possess. ([*Id.*,] § 2316.) Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess.' " (*Enmark v. KF Community Care, LLC* (Sept. 25, 2024, B333022) ___ Cal.App.5th ___, ___ [2024 Cal.App.LEXIS 606, p. *8] (*Enmark*).) Agency may be created, and authority conferred, by a principal's subsequent ratification of an agent's conduct. (Civ. Code, § 2307.) "Ordinarily, the law requires that a principal be apprised of all the facts surrounding a transaction before he will be held to have ratified the unauthorized acts of an agent. However, where ignorance of the facts arises from the principal's own failure to investigate and the circumstances are such as to put a reasonable man upon inquiry, he may be held to have ratified despite lack of full knowledge." (*Volandri v. Hlobil* (1959) 170 Cal.App.2d 656, 659.)

In the trial court, Mosaic argued that even if Harold did not physically sign the agreement, it was nonetheless binding upon him. First, Mosaic asserted that Deon's actions "in holding herself out as a representative of [Harold] on the recorded Welcome Call with a representative of [Mosaic] supported a finding that she was authorized to act as [his] agent with regard

11

to the Loan Agreement transaction." Second, Mosaic argued Harold later ratified the agreement through the recorded telephone call in which he responded affirmatively to information regarding the loan. The trial court, however, ruled that the brief conversation between Harold and the Mosaic representative was "insufficiently clear to demonstrate any ratification or even awareness of Deon West having just executed a loan agreement or arbitration agreement on his behalf," and that Mosaic had not presented evidence that Deon had actual or ostensible authority to bind Harold to the agreement containing the arbitration provision.

On appeal, Mosaic argues that the recorded telephone call does in fact demonstrate Harold's ratification of the loan agreement.[4] Mosaic points out that its representative repeatedly referred to a loan during the conversation, Harold responded in

---

[4] Sensibly, Mosaic does not renew the argument it made in the trial court that Deon was Harold's actual or ostensible agent. Mosaic presented no evidence that Harold consented to Deon acting as his agent, and the Mosaic representative did not ask Harold whether he had authorized Deon to act on his behalf. "The hallmarks of actual agency are consent and control: ' " 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' " ' " (*Enmark, supra*, __ Cal.App.5th at p. ___, [2024 Cal.App.LEXIS 606, p. *9].) As for ostensible agency, it is plain that Mosaic did not believe Deon was authorized to act as Harold's agent. Had Mosaic believed Deon was entitled to act for Harold, there would have been no reason for the representative to ask Deon to put Harold on the phone—the representative would have run through the required disclosures with Deon and inquired of Deon, not Harold, whether she understood.

12

the affirmative to the representative's questions whether he understood, and Harold neither objected to a loan nor disputed the stated repayment obligations.[5]  It argues Harold was made aware of the transaction during the call and had a reasonable duty to inquire of the representative regarding the circumstances of the loan.  Mosaic concludes that because Harold did not object to the loan transaction during the telephone call, he ratified his daughter's conduct and is thus bound by the arbitration provision in the loan agreement.

" ' "[W]here, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor." ' " (*Fabian, supra*, 42 Cal.App.5th at p. 1067.)

Here, the court found the telephone call lacked sufficient weight to carry Mosaic's burden of proof regarding ratification, and the record does not compel a contrary finding as a matter of law.  On appeal, we view all factual matters favorably to the court's order and do not reweigh the evidence.  (*Fabian, supra*, 42 Cal.App.5th at p. 1067.)  Given the content and brevity of the call and the lack of comprehension demonstrated by Harold during the conversation, we cannot say the recorded telephone

---

[5]  Mosaic contended at oral argument that it may be inferred that Harold understood the arrangements being made because he had been fully informed about and discussed the contract with Mitmiger in the family's living room.  However, Mitmiger's declaration does not indicate that Harold personally discussed any contract during this meeting, nor does it identify any specific statement or action by Harold indicating any understanding of the transactions entered into in his name.  To the contrary, Deon observed in her declaration that Harold did not appear to understand what was happening.

13

call is of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding of ratification.[6] (See *ibid*.)

As for Mosaic's cursory, insufficiently developed argument in a footnote that Harold ratified the agreement by accepting the benefits of the loan, i.e., Elite performed work on the house for several weeks using the funds Mosaic issued pursuant to the loan agreement, "[f]ootnotes are not the appropriate vehicle for stating contentions on appeal." (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947; see also *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 160 ["We do not have to consider issues discussed only in a footnote"]; Cal. Rules of Court, rule 8.204(a)(1)(B) [requiring points on appeal to be stated under a separate heading summarizing the point].)

---

[6] At oral argument, Mosaic argued that the trial court did not expressly find that Harold lacked capacity, so the evidence does not establish he was incapable of entering into or ratifying the contract. There was no need for the court to make any finding about Harold's overall competence or lack of capacity; all that matters in this analysis is whether Harold understood what was happening here, and the trial court found the recorded conversation did not demonstrate any awareness on Harold's part that Deon had just entered into a loan agreement on his behalf.

14

## DISPOSITION

The order denying the petition to compel arbitration is affirmed.  Respondents shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**


STRATTON, P. J.

We concur:


GRIMES, J.


WILEY, J.